# TAB 6

| | | |
|---|---|---|
| *1.* | *Seller:* | **DUNCAN DUVALL**<br>310 Highland Village Road, Highland Village, Texas 75077 |
| *2.* | *Buyer:* | **CHARITH DEVELOPMENT CORP, a Texas Corporation**<br>2380 FM 407, Highland Village, Texas 75077 |
| *3.* | *Property:* | The real property situated in DENTON County, Texas<br>described as follows: |

Being a tract of land situated in the W.P. Pearce Survey, Abstract No. 1015 and the Francis Pearce Survey, Abstract 1016, Denton County, Texas, and being a part of a called 24.6 acre tract of land described by deed to Murray Duncan Duvall as recorded under County Clerk's File No. 95-R000856 of the Real Property Records of Denton County, Texas, and being the remainder of a called 29.192 acre tract of land described by Deed to Murray Duncan Duvall as recorded under County Clerk's File No. 95-R000854 of the Real Property Records of Denton County, Texas, and being more particularly described in **Exhibit A** attached hereto and incorporated herein for all intents and purposes, together with all rights, privileges and appurtenances pertaining thereto, including any right, title and interest of Seller in and to adjacent streets, alleys, or rights-of-way.

*4.* **Sales Price:**
The sales price for the Property is **$3,385,000.00**, payable as set forth and according to the provisions in Addendum A, SELLER FINANCING., incorporated herein by reference and made a part of this Contract for all purposes.

*Adjustment*: The Sales Price will NOT be adjusted up or down based upon the land area of the Property as determined by any survey.

---

Seller agrees to sell and convey to Buyer, and Buyer agrees to buy from Seller the Property, for the Sales Price, on the terms and conditions set forth herein.

---

*5.* **Third-Party Financing:** NONE
This Contract is not conditioned on the Buyer obtaining financing from a third-party lender.

*6.* **Earnest Money Deposit:**
Within two (2) business days after the Effective Date of this Contract, Buyer shall deposit earnest money in the form of a certified check, cashier's check or wire transfer in the amount of **Ten Thousand and No/100 Dollars ($10,000.00)** (the "Earnest Money") with **LAND AMERICA TITLE (AMERICAN TITLE COMPANY - ATTN: Cathy McMullen)**, at 3360 Long Prairie Road, Suite 200, Flower Mound, Texas 75022 (the "Escrow Agent"). Seller's acceptance of this Contract is expressly conditioned upon Buyer's timely deposit of all Earnest Money with the Escrow Agent. The Earnest Money shall not be deposited in an



EXHIBIT NO. 43
K. Bradford

**GF 0740 0511**

APP 000052

interest bearing account. If Buyer fails to timely deposit the Earnest Money as required by this Contract, Buyer shall be in material breach hereof and, at Seller's option, Seller may, upon notice to Buyer, terminate this Contract and declare same to be null and void.

7. *Title Notices:*
   **Homeowner Association** - The Property is NOT subject to mandatory membership in an owners' association and its assessments and requirements.

   **Notice Regarding Unimproved Property Located in a Certified Service Area** If the Property is unimproved and is located in a certified service area of a utility service, then Seller shall give to Buyer a written notice in compliance with Section 13.257 of the Texas Water Code, and Buyer agrees to acknowledge receipt of the notice in writing. The notice must set forth the correct name of the utility service provider authorized by law to provide water or sewer service to the Property, and must comply with all other applicable requirements of the Texas Water Code.

   **Special Assessment Districts** - If the Property is situated within a utility district or flood district subject to the provisions of Section 49.452 of the Texas Water Code, then Seller shall give Buyer as part of the title documents the required written notice and Buyer agrees to acknowledge receipt of the notice in writing. The notice must set forth the current tax rate, the current bonded indebtedness and the authorized indebtedness of the district, and must comply with all other applicable requirements of the Texas Water Code.

   **Notice Regarding Possible Annexation** - If the Property that is the subject of this Contract is located outside the limits of a municipality, the Property may now or later be included in the extraterritorial jurisdiction of the municipality and may now or later be annexed by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

   **Notice for Property Located in an Agricultural Development District** - If the Property is located in an agricultural development district, then in accordance with Section 60.063 of the Texas Agricultural Code: (1) Seller shall give to Buyer a written notice that the Property is located in such district; (2) Buyer agrees to acknowledge receipt of the notice in writing; and (3) at the Closing, a separate copy of the notice with the current information about the district will be executed by Seller and Buyer and recorded in the deed records of the county in which the Property is located.

GF 0740 0512

APP 000053

8.  **Title Policy:**
    Seller to furnish to Buyer, at <u>Seller's</u> expense, an Owner Policy of Title Insurance (the "Title Policy") issued by the underwriter for AMERICAN TITLE COMPANY ("Title Company") in the amount of the Sales Price, dated at or after closing, insuring Buyer against loss under the provisions of the Title Policy, subject to the promulgated exclusions (including existing building and zoning ordinances) and the following exceptions as may be approved by Buyer: (1) restrictive covenants affecting the Property, (2) the standard printed exception for standby fees, taxes, and assessments, (3) utility easements affecting the Property, (4) reservations or exceptions otherwise permitted by this Contract or as may be approved by the Buyer in writing, (5) any matter which may be shown on a survey of the Property, and the standard printed exception as to discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements, (6) the standard printed exception as to marital rights, and (7) the standard printed exception as to waters, tidelands, beaches, streams, and related matters. Any modification of the survey deletion exception or any other standard title policy exception shall be at <u>Buyer's</u> expense.

    TITLE COMMITMENT: Buyer, at no cost or expense to Seller, may request from the Title Company a Commitment for Title Insurance (the "Title Commitment") including legible copies of recorded documents evidencing title exceptions (the "Title Documents"). The Title Company shall deliver the Title Commitment and related documents to Buyer at Buyer's address.

9.  **Survey:**
    Seller represents to Buyer that Seller does NOT have an existing on-the-ground survey of the Property. A new current on-the-ground survey acceptable to the Title Company may be obtained at Buyer's sole expense (the "Survey") during the Review Period under Section 10 of this Contract.

10. **Review Period, Inspections, Cure Period, AND Acceptance of Property:**
    Buyer shall have until **5:00PM, CST, thirty (30) days after the Effective Date** (the "Review Period") to review the Title Commitment, Title Documents, and the Survey and to deliver in writing to the Title Company and Seller any objections Buyer may have to them or any item disclosed by them. Any item to which Buyer does not object will deemed a "Permitted Exception." Those items that the Title Company identifies to be released upon Closing will be deemed objections. Buyer's failure to object within the Review Period will be a waiver of the right to object. If Buyer timely delivers any written objections to Seller and the Title Company within the Review Period, then Seller shall make a good faith attempt to satisfy such objections, but Seller shall not be required to incur any cost to do so. Zoning ordinances and the lien for current taxes are deemed to be Permitted Exceptions.

    CURE PERIOD: If Seller delivers written notice to Buyer on or before **5:00PM, CST, the third (3rd) business day after the expiration of the Review Period**

that Seller is unable to satisfy such objections or if, for any reason, Seller is unable to convey title reasonably satisfactory to Buyer then this Contract shall be deemed terminated and the parties will have no further rights or obligations under this Contract (except for any that expressly survive the termination) unless Buyer waives such objections and accepts such title as Seller is able to convey by notifying the Seller and Title Company in writing and timely closes this transaction as set forth herein . Seller's failure to satisfy Buyer's objections or convey title reasonably satisfactory to Buyer does not constitute a default by Seller.

INSPECTIONS: **Prior to 5:00PM, CST, thirty (30) days after the Effective Date** (the "Inspection Period"), Buyer (at Buyer's expense) may complete or cause to be completed inspections of the Property by inspectors of Buyer's choice and shall have reasonable access during normal business hours and upon reasonable advance notice to Seller to conduct such inspections, studies, tests and examinations deemed necessary by Buyer and that will not prevent Seller from conducting his normal and customary business on the Property during such inspections. Buyer agrees that Seller has not made, and is not making, any representation, covenant, guaranty or warranty as to the condition of the Property, including improvements thereon, or the environmental condition of the Property, and that Buyer will rely solely on its own independent inspection and assessment of the Property hereunder.

Buyer shall have the right during the Inspection Period to conduct an environmental assessment of the Property that may include a "Phase I" investigation into the existence of hazardous materials in, on or around the Property. If the transaction described in this Contract does not close through no fault of Seller, and the condition of the Property was altered due to inspections, studies, tests or examinations performed by Buyer or on Buyer's behalf, then Buyer must restore the Property to its original condition at Buyer's expense. The term "hazardous materials" shall mean any pollutants, toxic substances, oils, hazardous wastes, hazardous materials or substances as defined in or pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended, the Clean Water Act, as amended, or any other federal, state or local environmental law, ordinance, rule or regulation in existence as of the Effective Date of this Contract or prior to the Closing Date. In any event, Buyer's inspections, studies, tests and examinations will not alter the Property in such a manner to prevent or otherwise unreasonably hinder Seller from being able to operate his business as contemplated under the lease agreement immediately after the closing of this transaction. Buyer shall defend and indemnify Seller against any claims that arise due to any actions by Buyer or Buyer's agents, employees, consultants and contractors other than any claims that arise as a result of the need to comply with Hazardous Substance Laws (as hereinafter defined).

If Buyer determines, in Buyer's sole judgment, that the Property is <u>not</u> suitable for any reason for Buyer's intended use or is not in satisfactory condition, then Buyer may terminate this Contract by providing written notice of termination and deliver to Seller contemporaneously with the termination, copies of all reports

GF 0740 0514

APP 000055

of inspections, studies, or assessments completed or caused to be completed by Buyer under this paragraph within the time required to complete the inspections, studies, or assessments under this paragraph. If Buyer does <u>not</u> timely terminate this Contract within the Inspection Period, any objections with respect to the inspections, studies and assessments under this paragraph shall be deemed waived by Buyer.

ACCEPTANCE OF PROPERTY: At Closing, Buyer agrees that it will accept the Property, including all buildings and improvements thereon on in its <u>AS IS</u>, <u>WHERE IS</u> condition, <u>WITH ALL FAULTS</u>, if any. Buyer understands and agrees that the following provision will be included in the Seller's warranty deed delivered to Buyer, to-wit:

"Except as specifically stated herein or as expressly provided in the Commercial Earnest Money Contract dated **December ____, 2005**, GRANTEE ACKNOWLEDGES AND AGREES THAT GRANTOR HAS NOT MADE, AND GRANTOR HEREBY SPECIFICALLY DISCLAIMS, ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING (a) THE NATURE AND CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, AND THE SUITABILITY THEREOF AND OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH GRANTEE MAY ELECT TO CONDUCT THEREON; (b) THE EXISTENCE, NATURE AND EXTENT OF ANY RIGHT-OF-WAY, LEASE, RIGHT TO POSSESSION OR USE, LIEN, ENCUMBRANCE, LICENSE, RESERVATION, CONDITION OR OTHER MATTER AFFECTING TITLE TO THE PROPERTY, AND (c) THE COMPLIANCE OF THE PROPERTY OR ITS OPERATION WITH ANY LAWS, ORDINANCES OR REGULATIONS OF ANY GOVERNMENTAL OR OTHER BODY. GRANTEE ACKNOWLEDGES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, GRANTEE IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED BY GRANTOR. GRANTEE FURTHER ACKNOWLEDGES THAT ANY INFORMATION PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND GRANTOR, EXCEPT AS EXPRESSLY PROVIDED IN THE SAID CONTRACT OF SALE (a) HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND (b) MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. THE CONVEYANCE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE BY GRANTOR TO GRANTEE, ON AN "AS IS, WHERE IS, AND WITH ALL FAULTS" BASIS. GRANTEE EXPRESSLY ACKNOWLEDGES THAT, EXCEPT AS OTHERWISE SPECIFIED HEREIN, GRANTOR MAKES NO WARRANTY OR REPRESENTATION, ORAL OR WRITTEN, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW,

APP 000056

INCLUDING, BUT NOT LIMITED TO ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, TENANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE, WITH RESPECT TO THE PROPERTY.

WITHOUT LIMITING THE FOREGOING AND BY ACCEPTANCE OF THIS DEED, GRANTEE ACKNOWLEDGES THAT THE GRANTOR DOES NOT AND HAS NOT MADE ANY REPRESENTATION OR WARRANTY REGARDING THE PRESENCE OR ABSENCE OF ANY HAZARDOUS SUBSTANCE (AS HEREINAFTER DEFINED) ON, UNDER OR ABOUT THE PROPERTY OR THE COMPLIANCE OR NONCOMPLIANCE OF THE PROPERTY WITH THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT, THE SUPERFUND AMENDMENT AND REAUTHORIZATION ACT, THE RESOURCE CONSERVATION AND RECOVERY ACT, THE FEDERAL WATER POLLUTION CONTROL ACT, THE FEDERAL ENVIRONMENTAL PESTICIDES ACT, THE CLEAN WATER ACT, THE CLEAN AIR ACT, THE TEXAS NATURAL RESOURCES CODE, THE TEXAS WATER CODE, THE TEXAS SOLID WASTE DISPOSAL ACT, ANY SO CALLED FEDERAL, STATE OR LOCAL "SUPERFUND" OR "SUPERLIEN" STATUTE, OR ANY OTHER STATUTE, LAW, ORDINANCE, CODE, RULE, REGULATION, ORDER OR DECREE REGULATING RELATING TO OR IMPOSING LIABILITY (INCLUDING STRICT LIABILITY) OR STANDARDS OF CONDUCT CONCERNING ANY HAZARDOUS SUBSTANCES (collectively, the "Hazardous Substance Laws"). For purposes hereof, the term "Hazardous Substances" shall mean and include any substance, whether solid, liquid or gaseous (a) which is listed, defined or regulated as a hazardous substance, hazardous waste or solid waste, or otherwise classified as hazardous or toxic, in or pursuant to any Hazardous Substance Laws; (b) which is or contains asbestos, radon, any polychlorinated biphenyl, urea formaldehyde insulation, or explosive or radioactive material, (c) which is or contains petroleum, petroleum products, including any fractions or distillates thereof; or (d) which causes or poses a threat to cause a contamination or nuisance on the Property or on any adjacent property or a hazard to the environment or to the health or safety of persons on the Property. As used in this section, the word "on" when used with respect to the Property or adjacent property means "on, in, under, above or about."

This agreement, waiver and release of claims shall survive the closing of the Contract transaction and shall not be merged therein."

11.   *Brokers:*      None

12.   *Closing and Possession:*
The closing of the sale shall be at the offices of the Escrow Agent on or before **3:00 P.M., CST the fifth (5th) business day after the expiration of the Review and the Inspection Periods** (the "Closing Date"), and possession of the Property shall be delivered to Buyer at the closing and funding of the transaction subject to the express terms and conditions of the Seller's and Buyer's lease agreement which have been negotiated along with this Contract, said lease agreement

GF 0740 0516

APP 000057

incorporated herein. Buyer and Seller, however, may agree to close the transaction sooner or later by mutual written agreement. In the event the Closing Date is not a day on which the Title Company is regularly open for business, then the Closing shall be held on the next ensuing day on which the Title Company is regularly open for business.

At the Closing, Seller shall deliver to Buyer a general warranty deed conveying good and indefeasible fee simple title to the Property free and clear of any and all liens, assessments, easements, security interests and other encumbrances except the Permitted Exceptions. The general warranty deed shall include the Acceptance of Property provision set forth in Section 10 of this Contract. Delivery of the Title Policy will be deemed to satisfy the obligation of Seller as to the sufficiency of title required under this Contract. However, delivery of the Title Policy will not release Seller from the warranties of title set forth in the warranty deed. At the Closing, Buyer shall deliver to Seller the cash portion of the Sales Price, with the Earnest Money being applied thereto. Both Seller and Buyer shall execute the lease agreement and such other documents as may be approved by the parties and reasonably required by the Title Company to consummate the transaction.

**13.** *Prorations:*
Current year (2005) ad valorem taxes and assessments against the Property shall be prorated as of the Closing Date. If the amount of taxes and assessments for the current year are not available on the Closing Date, proration shall be made on the basis of ad valorem taxes and assessments in the previous year and no further proration shall be required or made between the parties. If this sale or Buyer's use of the Property after Closing results in the assessment of additional taxes for periods prior to Closing, the additional taxes shall be the obligation of Buyer, which obligation shall survive the Closing.

**14.** *Sales Expenses:*
In addition to the expenses stipulated to be paid as set forth in other provisions of this Contract, the following expenses shall be paid at or prior to Closing:

(A)    Seller shall pay for any releases of existing liens including recording fees, tax statements or certificates, preparation of the warranty deed, one-half of the escrow fee charged by the Title Company, Seller's attorney fees;

(B)    Buyer shall pay for any origination or application fees and prepaid items required by a lender, expenses incident to obtaining a loan (i.e., preparation of any note, deed of trust and other loan documents, recording fees, tax service fees, copies of restrictions and easements, amortization schedule, premiums for mortgagee title policies and endorsements required by lender; credit reports, photos), any required reserve deposits for ad valorem taxes and special assessments, one-half of the escrow fee charged by the Title Company, and all other normal and reasonable closing costs except those specifically set forth herein as an expense to Seller.

**15.** *Escrow:*

If this Contract is properly and timely terminated by Buyer pursuant to the terms hereof, the Earnest Money will be immediately returned to the Buyer and neither party will have any further rights or obligations under this Contract (except for any that expressly survive the termination). If Buyer does not terminate this Contract, then the Earnest Money shall be applied to the Sales Price at Closing. Any refund or disbursement of Earnest Money under this contract shall be reduced by the amount of unpaid expenses incurred on behalf of the party receiving the Earnest Money, and Escrow Agent shall pay the same to the creditors entitled thereto. The Earnest Money is deposited with Escrow Agent with the understanding that Escrow Agent is not (a) a party to this contract and does not have any liability for the performance or non-performance of any party to this contract, or (b) liable for the payment of interest on the Earnest Money.

**16.** *Casualty Losses and Condemnation:*

DAMAGE OR DESTRUCTION: All risk of loss to the Property will remain upon Seller before the Closing. If, prior to Closing, the Property is damaged or destroyed by fire or other casualty where the cost of repair exceeds ten percent (10%) of the Sales Price, then Buyer may either terminate this Contract by delivering a written termination notice to Seller or elect to close. If, before the Closing, the Property is damaged by fire or other casualty to less than ten percent (10%) of the Sales Price, the parties shall proceed to Closing as provided in this Contract despite any damage or destruction and there will be no reduction in the Sales Price and the Seller shall do one of the following: (1) fully repair the damage before the Closing, at Seller's expense; (2) give credit to Buyer at the Closing for the entire cost of repairing the building(s) on the Property; or (3) assign to Buyer all of Seller's right and interest in any insurance proceeds resulting from the damage or destruction.

CONDEMNATION: If condemnation proceedings are commenced against any portion of the Property prior to Closing, then Seller shall immediately notify Buyer in writing of the condemnation proceedings, and Buyer may (1) terminate this Contract by written notice to Seller within five (5) days after Buyer is advised of the condemnation proceeding (and in any event before Closing), in which case the Earnest Money shall be refunded to Buyer and the parties shall have no further rights or obligations under this Contract; or (2) appear and defend in the condemnation proceeding, in which case any award in condemnation will, (a) if known as of Closing, belong to Seller and the Sales Price will be reduced by the same amount, or (b) if not known as of Closing, belong to Buyer and the Sales Price will not be reduced.

**17.** *Default:*

(A)    If Buyer fails to close this Contract for any reason except Seller's default or termination of this Contract pursuant to a right to terminate set forth in this Contract, Buyer will be in default and Seller may terminate this Contract and

GF 0740 0518

APP 000059

immediately receive the Earnest Money as liquidated damages for Buyer's breach of this Contract, thereby releasing Buyer from this Contract.

(B)   If Seller fails to close this Contract for any reason except Buyer's default or termination of this Contract pursuant to a right to terminate set forth in this Contract, Seller will be in default and Buyer may terminate this Contract by delivering a written notice to Seller as its sole remedy; provided, however, Buyer shall be entitled to reimbursement of Buyer's actual, out-of-pocket expenses paid by Buyer to independent third-parties in connection with this Contract including reasonable fees and expenses for inspectors, engineering assessments, environments assessments, and surveys.   Seller's failure to satisfy Buyer's objections under <u>Section 10</u> above shall not constitute a default by Seller.

18.   *Representations:*
Seller represents that as of the Closing Date there will be no liens, assessments, or other security interests against the Property that will not be satisfied out of the Sales Price.

19.   *Notices:*
All notices or demands between the parties shall be in writing and effective when either (1) hand delivered to the address of the party set forth on PAGE 1 of this Contract, along with a copy to the respective party's attorney, or (2) sent by facsimile transmission to the telephone numbers set forth below. Either party may change the address for notices by giving the other party five (5) days advance written notice of such change of address or facsimile telephone number.

Buyer fax # 972-317-9455

Buyer's attorney fax # 972-906-9204, Attn: Thomas D. Moore, Jr.
Address:       Blume, Stoddard & Moore,
              2631 Cross Timbers, Ste. 201, Flower Mound, TX  75028

Seller fax # 972-318-0567 (c/o Paul Confer)

Seller's attorney fax # 972-394-2888, Attn: Burt R. Solomons
Address:       1209 Stillwater Trail, Carrollton, TX  75007

20.   *Assignment Permitted:*
The Buyer may assign this Contract and the lease agreement provided that the assignee assumes in writing all obligations and liabilities under this Contract, and the Seller is given not less than three (3) business days written notice of the assignee's complete name, address and telephone number.  The Buyer will remain liable under this Contract after any assignment through the Closing, after which event the Buyer will be relieved of any further liability under this Contract and the lease agreement. Any security deposit will be made payable to the assignee which shall be liable therefor. This Contract shall be binding upon and inure to the

benefit of the parties hereto, their heirs, executors, administrators, legal representatives and permitted assigns.

21. **Agreement of the Parties:**
*This Contract contains the entire agreement of the parties and cannot be changed except by their written agreement.* This agreement shall be binding on the parties, their heirs, executors, representatives, successors, and assigns. This Contract shall be construed under and in accordance with the laws of the State of Texas. The parties agree and consent that venue of any action brought under this Contract shall be in DENTON County, provided, however, that venue of such action is legally proper in DENTON County, Texas.

22. **Severability:**
In case any one or more of the provisions contained in this Contract shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Contract shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

23. **Terminology:**
The captions beside the section numbers of this Contract are for reference only and shall not modify or affect this Contract in any manner whatsoever. Wherever required by the context, any gender shall include the other gender, the singular shall include the plural, and the plural shall include the singular.

24. **Federal Tax Requirement:**
If Seller is a "foreign person" as defined by applicable federal law, then Buyer shall be entitled to withhold from the sales proceeds an amount sufficient to comply with applicable federal tax law and deliver the same to the Internal Revenue Service together with appropriate tax forms. IRS regulations require filing written reports if cash in excess of specified amounts is received in the transaction.

25. **Time is of the Essence:**
Time is of the essence in the performance of this Contract. Strict compliance with the times for performance stated in this Contract is required.

26. **Business Day:**
If any date of performance under this Contract falls on a Saturday, Sunday or Texas legal holiday, such date of performance will be deferred to the next day that is not a Saturday, Sunday or Texas legal holiday.

27. **Effective Date:**
The Effective Date of this Contract for the purpose of performance of all obligations shall be the date this Contract is receipted by the Escrow Agent after all parties have executed this Contract.

GF 0740 0520

---

**28.    *Additional Provisions (if any)*:**

(a) Buyer agrees to allow Seller remain in possession of the Property under a lease agreement through April 30, 2007 in order to complete various contractual obligations for the use of the facility and premises (see, <u>Exhibit "B"</u> - Lease Agreement)

(b) All mineral rights shall be reserved to Seller in order that Seller may donate such mineral rights to New Horizons Ranch for Children, a 501(c)(3) non-profit organization and obtain available IRS credit for such donation.

(c) During the Review and Inspection Period, Seller shall reasonably allow Buyer, its agents and licensees, onto the Property to perform all necessary inspections and to obtain a survey. Prior advance verbal or written notice of said inspections shall be reasonably given to Seller so as to not unreasonably interfere with the use of the building or facilities by persons or organizations that have contracted with Seller.

(d) As it is the intent of the Seller and Buyer not to publicize the sale and purchase of the Property, the parties agree that from the date hereof until this Contract either is lawfully terminated or closed, Seller shall direct any press inquiries to the Buyer for response. Upon the closing of the transaction, including the execution of the lease agreement, Seller shall direct any press inquiries regarding the transaction to the Buyer for response; provided, however, that Buyer may respond to and make statements in connection with the continued operation of Seller's business and use of the Property by Seller. In any event, Seller shall not be liable to Buyer for any statements made to the press in connection with Seller's business.

*Buyer:*     **CHARITH DEVELOPMENT CORP.,**
             **a Texas Corporation**

             By: _____
                 **FRED O. PLACKE, III**
                 President

             *Date Signed:*  DECEMBER 30, 2005

*Seller:*    _____
             **DUNCAN DUVALL**

             *Date Signed:*  DECEMBER 30, 2005

GF 0740 0521

APP 000062

| RECEIPT of Contract and Earnest Money |
|---|

The Contract, together with the Buyer's Earnest Money, has been received by the Escrow Agent for the Title Company this the *3rd* day of *January*, 20 *06*.

**LAND AMERICA - AMERICAN TITLE COMPANY**

By: *Cathy McMullen*
       **Cathy McMullen**
       Sr. Vice President

APP 000063

## Exhibit A

Being a tract of land situated in the W. P. Pearce Survey, Abstract No. 1015 and the Francis Pearce Survey, Abstract No. 1016, Denton County, Texas, and being a part of a called 24.6 acre tract of land described by deed to Murray Duncan Duvall as recorded under County Clerk's File No. 95-R000856 of the Real Property Records of Denton County, Texas, and being the remainder of a called 29.192 acre tract of land described by deed to Murray Duncan Duvall as recorded under County Clerk's File No. 95-R000854 of the Real Property Records of Denton County, Texas, and being more particularly described as follows:

BEGINNING at a 1/2 inch iron rod set at the northeast corner of said 24.6 acre tract and in Highland Village Road;

THENCE South 03 degrees 36 minutes 20 seconds West, with the east line of said 24.6 acre tract and the west monumented line of Edgewood Estates, an addition to the City of Highland Village as recorded in Volume 7, Page 11 of the Plat Records of Denton County, Texas, a distance of 1288.09 feet to a 1/2 inch iron rod set in the north line of a United States of America Corps of Engineers Tract;

THENCE with the United States of America Corps of Engineers Tract, the following courses and distances:

South 72 degrees 34 minutes 53 seconds West, a distance of 63.75 feet to a 1/2 inch iron rod found for corner;

North 69 degrees 59 minutes 26 seconds West, a distance of 82.11 feet to a 1/2 inch iron rod found for corner;

South 45 degrees 59 minutes 39 seconds East, a distance of 97.88 feet to a 1/2 inch iron rod found for corner;

South 42 degrees 03 minutes 56 seconds East, a distance of 104.98 feet to a 1/2 inch iron rod found for corner;

South 54 degrees 45 minutes 51 seconds East, a distance of 68.05 feet to a 1/2 inch iron rod found for corner;

South 85 degrees 45 minutes 12 seconds East, a distance of 105.20 feet to a 1/2 inch iron rod found for corner;

South 31 degrees 31 minutes 10 seconds West, a distance of 100.12 feet to a 1/2 inch iron rod found for corner;

South 38 degrees 26 minutes 40 seconds East, a distance of 143.3 feet to a 1/2 inch iron rod found for corner;

South 60 degrees 08 minutes 06 seconds West, a distance of 204.74 feet to a 1/2 inch iron rod found for corner;

South 24 degrees 37 minutes 55 seconds West, a distance of 163.81 feet to a 1/2 inch iron rod found for corner;

South 68 degrees 48 minutes 01 seconds West, a distance of 205.52 feet to a fence post found for corner;

South 54 degrees 36 minutes 35 seconds West, a distance of 259.51 feet to a 1/2 inch iron rod set at the

GF 0740 0523

APP 000064

most southerly southwest corner of said 29.190 acre tract and at the most easterly corner of Lot 4, Block J of Montclair Estates, an Addition to the City of Highland Village as recorded in Cabinet C, Page 145 of the Plat Records of Denton County, Texas;

THENCE with the easterly monumented line of said Montclair Estates, the following courses and distances;

North 35 degrees 23 minutes 25 seconds West, a distance of 407.08 feet to a 1/2 inch iron rod set for corner;

North 01 degrees 43 minutes 10 seconds East, a distance of 740.00 feet to a 1/2 inch iron rod set for corner;

North 55 degrees 30 minutes 00 seconds West, a distance of 204.61 feet to a 1/2 inch iron rod set for corner;

North 01 degrees 18 minutes 15 seconds East, a distance of 722.03 feet to a 1/2 inch iron rod set for corner;

North 43 degrees 33 minutes 20 seconds East, a distance of 533.09 feet to a 1/2 inch iron rod set in said Highland Village Road;

THENCE South 49 degrees 23 minutes 45 seconds East, with said Highland Village Road, a distance of 232.88 feet to a 1/2 inch iron rod set for corner;

THENCE South 89 degrees 46 minutes 10 seconds East, continuing with said Highland Village Road, a distance of 351.56 feet to the Point of Beginning and containing 36.264 acres of land, more or less, and being subject to any and all easements that may affect.

GF 0740 0524

APP 000065

**SELLER FINANCING**

***Property Address:*** 310 HIGHLAND VILLAGE ROAD, HIGHLAND VILLAGE, DENTON COUNTY

1. ***Down Payment at Closing:***
   TWO MILLION AND NO/100 DOLLARS (**$2,000,000.00**).
   This amount includes the Earnest Money on deposit with the Escrow Agent.

2. ***Promissory Note:***
   At Closing, Buyer shall execute and deliver a two (2) year promissory note (the "Note") payable to the order of Seller in the amount of **$1,385,000.00**, bearing interest at the fixed rate of EIGHT PERCENT (8%) per annum. Buyer shall make **interest only** installment payments on the unpaid and outstanding balance of the Note in regular and consecutive quarterly installments during the term of the Note. If the payment is ten (10) days or more late, Buyer will be charged a **late charge of five percent (5%)** of the unpaid portion of the regularly scheduled payment (but in any event not to exceed the maximum amount allowed by law).

3. ***No Assumption, Non-Recourse, & Limited Prepayment:***
   The Note will not be assumable by any person or entity without the prior written consent of Seller or other noteholder. The Seller or other noteholder will look only to the collateral provided by the Vendor's Lien and the Deed of Trust lien to enforce the payment of the indebtedness and will not seek a deficiency against the Buyer. Any non-recourse provision will not be construed to impair the rights of Seller or other noteholder to foreclose upon the liens securing the Note. The Note will include a provision for the payment of reasonable attorney's fees if the Note is placed in the hands of an attorney for collection and all incurred expenses and costs of collection. Buyer shall not have the right to prepay all or any portion of the Note until AUGUST 1, 2006.

   Upon or after AUGUST 1, 2006, Buyer shall the right to prepay the Note in full (but not in part except by application of insurance and condemnation proceeds or as hereinafter provided) by delivering to Seller written notice (the "Prepayment Notice") setting forth Buyer's intention to prepay all amounts due under the Note and the Deed of Trust securing the Note in full and specifying (i) the total amount outstanding principal balance being prepaid, and (ii) the prepayment date (the "Prepayment Date"), which shall be no less than thirty (30) days after receipt by Seller of the Prepayment Notice; however, it shall be a condition concurrent to such prepayment right that Buyer simultaneous pay to Seller the Prepayment Fee (hereinafter defined). For purposes hereof, the Prepayment Fee shall mean a sum equal to four (4) quarterly installment interest payments on the Note less accrued and paid interest through the Prepayment Date as a credit against the Prepayment Fee.

   Upon or after FEBRUARY 1, 2007, Buyer shall have the right to prepay the Note in full without the payment of a Prepayment Fee.

**4. *Security:***

The Note will be secured by a Vendor's Lien, a Deed of Trust and other documents that Seller may reasonably require to secure the Note. The Deed of Trust securing the Note will include a provision that any default in the payment of property taxes will constitute a default under the Deed of Trust securing the Note. The Deed of Trust will contain provisions for acceleration of maturity in the event of default or, at the Seller's or other noteholder's option, in the event all or part of the Property is sold, transferred, or further encumbered without the prior written consent of the Seller or other noteholder. The Deed of Trust will include a provision for the payment of reasonable attorney's fees if the Note is placed in the hands of an attorney for collection.

**5. *Payments:***

All payments, including any prepayment of the indebtedness as expressly provided in the Note, received by the Seller or other noteholder will be applied first to any incurred expenses, costs and/or reasonable attorney's fees in connection with the collection of the Note in the event of a delinquency or default, second to late charges, third to delinquent property taxes, fourth to accrued and unpaid interest, and last to the unpaid principal balance of the Note.

*Buyer:*  **CHARITH DEVELOPMENT CORP.,**
**a Texas Corporation**

By:

**FRED O. PLACKE, III**
President

*Date Signed:* DECEMBER 30, 2005

*Seller:*

**DUNCAN DUVALL**

*Date Signed:* DECEMBER 30, 2005

GF 0740 0526

APP 000067

**LEASE AGREEMENT**
**(Exhibit "B" to Commercial Earnest Money Contrat)**

Date: _____, 2006

Landlord: CHARITH DEVELOPMENT CORP., a Texas Corporation

Landlord's Address: 2360 FM 407, Highland Village, Texas 75077

Tenant: DUNCAN DUVALL

Tenant's Address: 310 Highland Village Road, Highland Village, Texas 75077

Premises

Being a tract of land situated in the W.P. Pearce Survey, Abstract No. 1015 and the Francis Pearce Survey, Abstract 1016, Denton County, Texas, and being a part of a called 24.6 acre tract of land described by deed to Murray Duncan Duvall as recorded under County Clerk's File No. 95-R000856 of the Real Property Records of Denton County, Texas, and being the remainder of a called 29.192 acre tract of land described by Deed to Murray Duncan Duvall as recorded under County Clerk's File No. 95-R000854 of the Real Property Records of Denton County, Texas, and being more particularly described in **Exhibit A** attached hereto and incorporated herein for all intents and purposes, together with all rights, privileges and appurtenances pertaining thereto, including any right, title and interest of Seller in and to adjacent streets, alleys, or rights-of-way.

Base Rent (monthly): ZERO (-0-)

Commencement Date: _____, 2006, or upon the closing and funding of the sale and purchase of the Premises from Tenant to Landlord, whichever date shall last occur.

Termination Date: APRIL 30, 2007; provided, however, that Tenant shall have the right to terminate this lease agreement prior to the Termination Date upon providing Landlord not less than thirty (30) days written notice of an earlier Termination Date.

Security Deposit: FIVE THOUSAND AND NO/100 DOLLARS ($5,000)

1

GF 0740 0527

APP 000068

Insurance:

During the term of this lease agreement, Tenant shall, at Tenant's expense, maintain in full force and effect from an insurer authorized to operate in Texas: (1) public liability insurance in an amount not less that $1,000,000.00 on an occurrence basis naming Landlord as an additional insured; and (2) personal property damage insurance for Tenant's business operations and contents on the Premises in an amount sufficient to replace such contents after casualty loss.

## Clauses and Covenants

**A.    Tenant agrees to:**

1.      Obey all laws, ordinances, orders, and rules and regulations applicable to the use, condition, and occupancy of the Premises.

2.      Pay for all utility services used by Tenant and not provided by Landlord.

3.      Allow Landlord to enter the Premises to perform Landlord's obligations, inspect the Premises, and show the Premises to prospective purchasers or tenants after providing Tenant reasonable advance verbal or written notice (except that no advance notice shall be required in the event of an emergency). In addition, Landlord shall have reasonable access during normal business hours and upon reasonable advance notice to commence necessary development activities in such a manner that will not prevent Tenant from conducting Tenant's normal and customary business on the Premises during the Term of this lease agreement.

4.      Repair, replace, and maintain (normal wear and tear excepted) any part of the Premises, including the buildings or other structures, that Tenant uses for his business operations including the air and heating systems.  Maintenance of the grounds shall be consistent with tenant's "historical practices" except to the extent such maintenance is prohibited, prevented or otherwise hindered by the commencement of development of the Premises by Landlord.  The term "historical practices" shall mean that maintenance which Tenant has normally conducted in the year prior to the commencement of this lease agreement.

5.      Repair any damage to the Premises caused by Tenant, customers, invitees, or employees.

6.      Submit in writing to Landlord any request for repairs, replacement, and maintenance that are the obligations of Landlord.

7.      Maintain public liability insurance for the Premises and the conduct of Tenant's business, naming Landlord as an additional insured, in the amounts stated in the lease. The public liability insurance policy shall not be canceled during the Term of this lease agreement except upon at least thirty (30) days to Landlord.

8.      Maintain insurance on Tenant's personal property.

9.      Deliver certificates of insurance to Landlord before the Commencement Date and

2

GF 0740 0528

APP 000069

thereafter when reasonably requested in writing by Landlord.

10.    Indemnify, defend, and hold Landlord harmless from any loss, reasonable attorney's fees, court and other costs, or claims arising out of Tenant's use of the Premises or by Tenant's employees, customers, or invitees. This indemnity is independent of Landlord's insurance and will survive the end of the Term. This indemnity, however, will not apply to the extent that an injury is caused by the negligence of Landlord or Landlord's employees, invitees, licensees, consultants, or contractors.

11.    Vacate the Premises on termination of this lease.

12.    Accept the Premises, including all buildings and improvements thereon in its AS IS, WHERE IS condition, WITH ALL FAULTS, if any.

THE LEASE OF THE PREMISES AS PROVIDED FOR HEREIN IS MADE BY LANDLORD TO TENANT, ON AN "AS IS, WHERE IS, AND WITH ALL FAULTS" BASIS. TENANT EXPRESSLY ACKNOWLEDGES THAT, EXCEPT AS OTHERWISE SPECIFIED HEREIN, LANDLORD MAKES NO WARRANTY OR REPRESENTATION, ORAL OR WRITTEN, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, TENANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE, WITH RESPECT TO THE PREMISES. WITHOUT LIMITING THE FOREGOING, TENANT ACKNOWLEDGES THAT LANDLORD DOES NOT AND HAS NOT MADE ANY REPRESENTATION OR WARRANTY REGARDING THE PRESENCE OR ABSENCE OF ANY HAZARDOUS SUBSTANCE (AS HEREINAFTER DEFINED) ON, UNDER OR ABOUT THE PREMISES OR THE COMPLIANCE OR NONCOMPLIANCE OF THE PREMISES WITH THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT, THE SUPERFUND AMENDMENT AND REAUTHORIZATION ACT, THE RESOURCE CONSERVATION AND RECOVERY ACT, THE FEDERAL WATER POLLUTION CONTROL ACT, THE FEDERAL ENVIRONMENTAL PESTICIDES ACT, THE CLEAN WATER ACT, THE CLEAN AIR ACT, THE TEXAS NATURAL RESOURCES CODE, THE TEXAS WATER CODE, THE TEXAS SOLID WASTE DISPOSAL ACT, ANY SO CALLED FEDERAL, STATE OR LOCAL "SUPERFUND" OR "SUPERLIEN" STATUTE, OR ANY OTHER STATUTE, LAW, ORDINANCE, CODE, RULE, REGULATION, ORDER OR DECREE REGULATING, RELATING TO, OR IMPOSING LIABILITY (INCLUDING STRICT LIABILITY) OR STANDARDS OF CONDUCT CONCERNING ANY HAZARDOUS SUBSTANCES (collectively, the "Hazardous Substance Laws"). For purposes hereof, the term "Hazardous Substances" shall mean and include any substance, whether solid, liquid or gaseous (a) which is listed, defined or regulated as a hazardous substance, hazardous waste or solid waste, or otherwise classified as hazardous or toxic, in or pursuant to any Hazardous Substance Laws; (b) which is or contains asbestos, radon, any polychlorinated biphenyl, urea formaldehyde insulation, or explosive or radioactive material, (c) which is or contains petroleum, petroleum products, including any fractions or distillates thereof; or (d) which causes or poses a threat to cause a contamination or nuisance on the Premises or on any adjacent property or a hazard to the

3

environment or to the health or safety of persons on the Premises. As used in this section, the word "on" when used with respect to the Premises or adjacent property means "on, in, under, above or about."

**B.    Tenant agrees not to:**

1.    Use the Premises for any purpose that violates any applicable state or federal law, regulation, zoning ordinance, restrictive covenant, or governmental order.

2.    Create a nuisance.

3.    Permit any waste.

4.    Use the Premises in any way that is extra hazardous, would increase insurance premiums, or would void insurance on the building.

5.    Alter the Premises without the written permission of Landlord.

6.    Allow a lien to be placed on the Premises.

7.    Assign this lease or sublease any portion of the Premises without Landlord's prior written consent.

**C.    Landlord agrees to:**

1.    Lease to Tenant the Premises for the entire Term beginning on the Commencement Date and ending on the Termination Date.

2.    Obey all laws, ordinances, orders, and rules and regulations applicable to the use, condition, and occupancy of the building.

3.    Provide normal utility service connections to the building.

4.    Pay all ad valorem taxes.

5.    Insure the building against all risks of direct physical loss in an amount equal to at least 90 percent of the full replacement cost of the building as of the date of the loss and liability; Tenant will have no claim to any proceeds of Landlord's insurance policy.

6.    Return the Security Deposit to Tenant, less itemized deductions, if any, within thirty days after the termination of this lease.

**D.    Landlord agrees not to:**

1.    Interfere with Tenant's possession and use of the Premises.

4

APP 000071

**E. Landlord and Tenant agree to the following:**

1.    *Alterations.* Any physical additions or improvements to the Premises made by Tenant will become the property of Landlord. Landlord may require that Tenant, at termination of this lease and at Tenant's expense, remove any physical additions and improvements, repair any alterations, and restore the Premises to the condition existing at the Commencement Date, normal wear excepted.

2.    *Release of Claims/Subrogation.* Landlord and Tenant release each other from any claim, by subrogation or otherwise, for any damage to the Premises, the building, or personal property within the building, by reason of fire or the elements, regardless of cause, including negligence of Landlord or Tenant. This release applies only to the extent that law permits it, the damage is covered by insurance proceeds, and the release does not adversely affect any insurance coverage.

3.    *Notice to Insurance Companies.* Landlord and Tenant will notify the issuing insurance companies of the release set forth in the preceding paragraph and will have the insurance policies endorsed, if necessary, to prevent invalidation of the insurance coverage.

4.    *Casualty/Total or Partial Destruction*

   a.    If the Premises are damaged by casualty and can be restored within sixty days, Landlord will, at its expense, restore the Premises to substantially the same condition that existed before the casualty. If Landlord fails to complete restoration within ninety days from the date of written notification by Tenant to Landlord of the casualty, Tenant may terminate this lease by written notice to Landlord.

   b.    If the Premises cannot be restored within sixty days, Landlord has an option to restore the Premises. If Landlord chooses not to restore, this lease will terminate. If Landlord chooses to restore, Landlord will notify Tenant of the estimated time to restore and give Tenant an option to terminate this lease by notifying Landlord within ten days. If Tenant does not terminate this lease, the lease will continue and Landlord will restore the Premises as provided in a. above.

5.    *Condemnation/Substantial or Partial Taking*

   a.    If the Premises cannot be used for the purposes contemplated by this lease because of condemnation or purchase in lieu of condemnation, this lease will terminate.

   b.    Tenant will have no claim to the condemnation award or proceeds in lieu of condemnation; provided, however, Tenant may seek compensation from the condemning authority for his moving expenses and damages to Tenant's personal property and his

5

GF 0740 0531

APP 000072

business operations.

7.     *Default by Landlord/Events.* Defaults by Landlord are failing to comply with any provision of this lease within thirty days after written notice.

8.     *Default by Landlord/Tenant's Remedies.* Tenant's remedies for Landlord's default are to sue for damages and, if Landlord does not provide an Essential Service for thirty days after default, terminate this lease. The term "Essential Service" shall mean access to any utility service or access necessary for Tenant's business that is terminated or caused, directly or indirectly, to be terminated by Landlord.

9.     *Default by Tenant/Events.* Defaults by Tenant are (a) abandoning or vacating a substantial portion of the Premises, and (b) failing to comply within thirty days after written notice with any provision of this lease.

10.     *Default by Tenant/Landlord's Remedies.* Landlord's remedies for Tenant's default are to (a) enter and take possession of the Premises and (b) terminate this lease by written notice.

11.     *Default/Waiver/Mitigation.* It is not a waiver of default if the nondefaulting party fails to declare immediately a default or delays in taking any action. Pursuit of any remedies set forth in this lease does not preclude pursuit of other remedies in this lease or provided by law. Landlord and Tenant have a duty to mitigate damages.

12.     *Holdover.* If Tenant does not vacate the Premises following termination of this lease, Tenant will become a tenant at will and must vacate the Premises on receipt of notice from Landlord. No holding over by Tenant, whether with or without the consent of Landlord, will extend the Term.

13.     *Alternative Dispute Resolution.* Landlord and Tenant agree to mediate in good faith before filing a suit for damages.

14.     *Attorney's Fees.* If either party retains an attorney to enforce this lease, the parties will be responsible for their respective reasonable attorney's fees and court and other costs.

15.     *Venue.* Venue is in DENTON COUNTY.

16.     *Entire Agreement.* This lease together with an Commercial Earnest Money Contract that is dated _____, 2005, executed by Landlord and Tenant, constitute the entire agreement of the parties, and there are no oral representations, warranties, agreements, or promises pertaining to this lease or to any expressly mentioned exhibits and riders not incorporated in writing in this lease.

17.     *Amendment of Lease.* This lease may be amended only by an instrument in writing signed by Landlord and Tenant.

6

GF 0740 0532

APP 000073

18.   *Limitation of Warranties.* THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY, OF FITNESS FOR A PARTICULAR PURPOSE, OR OF ANY OTHER KIND ARISING OUT OF THIS LEASE, AND THERE ARE NO WARRANTIES THAT EXTEND BEYOND THOSE EXPRESSLY STATED IN THIS LEASE.

19.   *Notices.* Any notice required or permitted under this lease must be in writing. Any notice required by this lease will be deemed to be delivered (whether actually received or not) when deposited with the United States Postal Service, postage prepaid, certified mail, return receipt requested, and addressed to the intended recipient at the address shown in this lease. Notice may also be given by regular mail, personal delivery, courier delivery, facsimile transmission, or other commercially reasonable means and will be effective when actually received. Any address for notice may be changed by written notice delivered as provided herein.

20.   *Abandoned Property.* Landlord may retain, destroy, or dispose of any property left on the Premises at the end of the Term.

21.   *Assignment:*   The Landlord may assign this lease agreement provided that the assignee must assume in writing all obligations and liabilities under this lease agreement including, but not limited to, the timely return of the security deposit to Tenant, less any itemized deductions (if any). In addition, the Tenant shall be given not less than fifteen (15) business days written notice of the assignee's complete name, physical and mailing addresses, telephone number, and be provided a legible copy of the assignment of this lease agreement with the assignees' agreement to assume all obligations and liabilities under this lease agreement including, but not limited to, the timely return of the security deposit to Tenant, less itemized deductions (if any).

22.   *Additional Provisions.*

(a)   Tenant, at Tenant's expense, is entitled to remove all personal property and other equipment, movable fixtures and improvements situated on the Premises prior to the Termination Date. The items shall include those described in the instrument entitled "Duvall Inventory Removal List" attached and made a part of this lease agreement.

*Landlord:*

**CHARITH DEVELOPMENT CORP.**
**a Texas Corporation**

By: _____
**FRED O. PLACKE, III**
President

7

GF 0740 0533

APP 000074

*Tenant*:

DUNCAN DUVALL

8

GF 0740 0534

APP 000075

## Exhibit A

Being a tract of land situated in the W. P. Pearce Survey, Abstract No. 1015 and the Francis Pearce Survey, Abstract No. 1016, Denton County, Texas, and being a part of a called 24.6 acre tract of land described by deed to Murray Duncan Duvall as recorded under County Clerk's File No. 95-R000856 of the Real Property Records of Denton County, Texas, and being the remainder of a called 29.192 acre tract of land described by deed to Murray Duncan Duvall as recorded under County Clerk's File No. 95-R000854 of the Real Property Records of Denton County, Texas, and being more particularly described as follows:

BEGINNING at a 1/2 inch iron rod set at the northeast corner of said 24.6 acre tract and in Highland Village Road;

THENCE South 03 degrees 36 minutes 20 seconds West, with the east line of said 24.6 acre tract and the west monumented line of Edgewood Estates, an addition to the City of Highland Village as recorded in Volume 7, Page 11 of the Plat Records of Denton County, Texas, a distance of 1288.09 feet to a 1/2 inch iron rod set in the north line of a United States of America Corps of Engineers Tract;

THENCE with the United States of America Corps of Engineers Tract, the following courses and distances:

South 72 degrees 34 minutes 53 seconds West, a distance of 63.75 feet to a 1/2 inch iron rod found for corner;

North 69 degrees 59 minutes 26 seconds West, a distance of 82.11 feet to a 1/2 inch iron rod found for corner;

South 45 degrees 59 minutes 39 seconds East, a distance of 97.88 feet to a 1/2 inch iron rod found for corner;

South 42 degrees 03 minutes 56 seconds East, a distance of 104.98 feet to a 1/2 inch iron rod found for corner;

South 54 degrees 45 minutes 51 seconds East, a distance of 68.05 feet to a 1/2 inch iron rod found for corner;

South 85 degrees 45 minutes 12 seconds East, a distance of 105.20 feet to a 1/2 inch iron rod found for corner;

South 31 degrees 31 minutes 10 seconds West, a distance of 100.12 feet to a 1/2 inch iron rod found for corner;

South 38 degrees 26 minutes 40 seconds East, a distance of 143.3 feet to a 1/2 inch iron rod found for corner;

South 60 degrees 08 minutes 06 seconds West, a distance of 204.74 feet to a 1/2 inch iron rod found for corner;

South 24 degrees 37 minutes 55 seconds West, a distance of 163.81 feet to a 1/2 inch iron rod found for corner;

South 68 degrees 48 minutes 01 seconds West, a distance of 205.52 feet to a fence post found for corner;

South 54 degrees 36 minutes 35 seconds West, a distance of 259.51 feet to a 1/2 inch iron rod set at the

GF 0740 0535

APP 000076

most southerly southwest corner of said 29.190 acre tract and at the most easterly corner of Lot 4, Block J of Montclair Estates, an Addition to the City of Highland Village as recorded in Cabinet C, Page 145 of the Plat Records of Denton County, Texas;

THENCE with the easterly monumented line of said Montclair Estates, the following courses and distances;

North 35 degrees 23 minutes 25 seconds West, a distance of 407.08 feet to a 1/2 inch iron rod set for corner;

North 01 degrees 43 minutes 10 seconds East, a distance of 740.00 feet to a 1/2 inch iron rod set for corner;

North 55 degrees 30 minutes 00 seconds West, a distance of 204.61 feet to a 1/2 inch iron rod set for corner;

North 01 degrees 18 minutes 15 seconds East, a distance of 722.03 feet to a 1/2 inch iron rod set for corner;

North 43 degrees 33 minutes 20 seconds East, a distance of 533.09 feet to a 1/2 inch iron rod set in said Highland Village Road;

THENCE South 49 degrees 23 minutes 45 seconds East, with said Highland Village Road, a distance of 232.88 feet to a 1/2 inch iron rod set for corner;

THENCE South 89 degrees 46 minutes 10 seconds East, continuing with said Highland Village Road, a distance of 351.56 feet to the Point of Beginning and containing 36.264 acres of land, more or less, and being subject to any and all easements that may affect.

GF 0740 0536

APP 000077

Duvall Inventory Removal List

Personal Property to be removed from Double Tree Ranch by Duncan Duvall

- All Tables & Chairs - Includes Main Building, Deck, Pool, & Pavilion
- 2 – Ping Pong Tables
- 1 – Bingo Set
- 1 – Overhead Projector & Screen
- 2 – Ice Machines
- 1 – Coke Machine – includes Jockey Boxes
- 1 – Beer Box
- All Taxidermy works
- 1 – Wagon Wheel Shrink in front Foyer
- 1 – Gris Mill in front Foyer – belongs to George Priddy
- All Neon Lights in Bar area
- All Free hanging Decorations including Pictures
- 1 – Coffee Machine & Pots
- 1 – Tea Machine
- 1 – Tea Machine – belongs to Sysco
- 1 – Water Filter - Belongs to Standguard

- 1 – Men's Sign over Men's Restroom
- 4 – 4 x 8 Staging
- All Televisions & PA Equipment & Radios including Speakers
- All Metal/Metro Shelving
- 1 – Delfield Refrigerator
- 1 – Stainless Steel Prep Table
- 1 – Knife Sharpener
- Everything in Office
- Everything in Store Room
- 1 – 50# Washer
- 1 – 25# Dryer
- 1 – 20" Buffer
- 1 – Wet or Dry Vacuum
- All Sports Equipment – including Ball Cage
- 1 – 6 Door Refrigerator
- 1 – Dishwasher belongs to ZEP products
- 1 – 3 compartment Stainless Steel Sink
- 80 gallon Hot Water Heater

GF 0740 0537

APP 000078

- 1 – 10 Burner Stove
- 2 – 35# Fryer's
- 2 – Convection Ovens
- 3 – LTO Ovens
- 2 – Convection Steamers
- 1 – 80 quart Mixer & Equipment
- 1 – 20 quart Mixer & Equipment
- 5 – Work Tables
- 1 – Pot Rack
- 1 – Potato Peeler
- 1 – 2 compartment Stainless Steel Sink
- 1 – Gas Grill & Microwave
- 2 – Bewley Smokers
- All Utility Carts
- All Kitchen Wares (pots, pans, silverware, plates, etc)
- All Cambro Boxes
- 1 – 10 x 20 Walk-in Cooler-Freezer
- 1 – 10 x 12 Walk-in Cooler-Freezer
- 3 – Charcoal Hamburger Grills
- All Trash Cans
- John Deere Gator & Trailer

- 1 – Wells Cargo Catering Trailer
- 1 – 53hp John Deere Tractor & Attachments
- 1 – Toro Zero-Turn Mower
- All of the Lawn & Garden Equipment & Tools
- All Contents of the House & Shop including Snap On Tool Box & Tools, Chop Saw, Weed Eaters, etc
- 1 – Graco spray gun & Supplies,
- 1 – 1hp Spray Washer
- 1 – Lake Fountain Pump
- 1 – Dinner Bell
- 2- Tank Smokers
- 1 – Kubota Tractor & trackless train cars
- 1 – Diesel Tank (500 gallons) & pump
- 1 – Gas Tank (200 gallons)
- 1 – Chicken Brooder & Supplies
- 1 – Green Metal Shed
- 5 – Deer Feeder Panels
- Assortment of Cattle Panels
- Assortment of Wagon Wheels
- 1 – Steel Wheel Roller

GF 0740 0538

- 8 – Terra Cotta Planters

- 1 – WPA Storm Cellar

- _1 – Double Tree Sign on front of building

- Phone #'s, Web Site, email Address

### *IF Building(s) to be Razed*

- All Wagon Wheel Fixtures (6)

- All Ceiling Fans

- Light Fixture @ Front Door

- Fireplace Screen

- Light Fixtures @ Swimming Pool & Front Gate

- Wagon Wheels @ Front Gate

- Double Tree Ranch tile work on front of bar

- Toilet Fixtures

GF 0740 0539

APP 000080